UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:22-CV-00119-GNS-HBB

GRANITE STATE INSURANCE COMPANY                                    PLAINTIFF

v.

KENNETH TAYLOR, JR. et al.                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment (DN 43), Defendants' Motion for Partial Summary Judgment (DN 44), and Plaintiff's Motion for Leave to Seal Document (DN 45).  The motions are ripe for decision.

## I.    SUMMARY OF THE FACTS

This action originally arose from Granite State Insurance Company ("Granite State") seeking to enforce a prior judgment for $1,366,378 plus interest against Star Mine Services, Inc. ("Star Mine").  *See Granite State Ins. Co. v. Star Mine Servs., Inc.*, 553 F. Supp. 3d 413, 424 (W.D. Ky. 2021) [hereinafter *Granite State I*]; (Mem. Op. & Order 3, DN 26).  Star Mine is a now-defunct Kentucky coal mine staffing company which was owned and operated as a closely-held corporation by Kenneth Taylor, Jr. ("Taylor"), Lee Bowles ("Bowles"), and J. Todd P'Pool ("P'Pool") (collectively, "Defendants").[1]  (Pl.'s Mot. Summ. J. Ex. 1, at 1, DN 43-1).  Bowles served as president, Taylor as secretary, and P'Pool as treasurer.  (Pl.'s Mot. Summ. J. Ex. 1, at 1; Bowles Dep. 8:14-17, Mar. 14, 2024, DN 43-3).

---

[1] Tax returns reflect that Taylor, Bowles, and P'Pool each owned one-third of the company. (Taylor Dep. 55:2-4, Mar. 8, 2024, DN 49-2; Pl.'s Mot. Summ. J. Ex. 14, at 1-3, DN 43-14).

For three policy periods starting in February 2016, Star Mine obtained workers' compensation insurance as required by Kentucky law through a policy ("Policy") issued by Granite State. KRS 342.630; (Pl.'s Mot. Summ. J. Ex. 4, at 1-50, DN 43-4). The Policy stipulated the method of calculation for the Policy premiums. (Pl.'s Mot. Summ. J. Ex. 4, at 5-10). Star Mine significantly underestimated its payroll for several years and ultimately ended up owing Granite State $345,443 in additional premiums. (Mem. Op. & Order 2 (citation omitted)).

Defendants later leased employees of Star Mine to an affiliate of Raleigh Mine and Industrial Supply, Inc. ("Raleigh"), Cherokee Resources, Inc. ("Cherokee"). (Pl.'s Mot. Summ. J. Ex. 7, at 1-9, DN 43-7). Defendants sold Star Mine to Raleigh on January 1, 2019, after Granite State had cancelled the Policy on October 16, 2018. (Pl.'s Mot. Summ. J. Ex. 7, at 1, DN 43-11; Pl.'s Mot. Summ. J. Ex. 9, at 1, DN 43-8). Defendants each received distributions of $70,000 in December 2018 from Star Mine which had a balance sheet value of $291,411.77 as of December 31, 2018. (Pl.'s Mot. Summ. J. Ex. 10, at 1-2, DN 43-9; Pl.'s Mot. Summ. J. Ex. 7, at 1, DN 43-15). Star Mine reported the price of its sale to Raleigh as $1,424,190. (Pl.'s Mot. Summ. J. Ex. 14, at 4). Taylor and Bowles each received $300,000 from the sale; P'Pool received $800,000. (Pl.'s Mot. Summ. J. Ex. 14, at 6).[2] Star Mine ultimately dissolved on January 31, 2019, after filing it articles of dissolution with the Kentucky Secretary of State. (Pl.'s Mot. Summ. J. Ex. 17, at 1, DN 43-17). Following the distributions to its shareholders, Star Mine had a cash balance of $20,495.07 on February 28, 2019. (Defs.' Resp. Pl.'s Mot. Summ. J. Ex. K, at 2, DN 49-11).

In this action, Granite State seeks summary judgment to collect from Defendants the amount of its judgment against Star Mine, which is $1,366,378 and $4,224.31 in costs plus

---

[2] Other items in the record give varying amounts for the respective distribution of each of the Defendants, but this is the amount recorded in Star Mine's financial statements. (Pl.'s Mot. Summ. J. Ex. 14, at 1-3).

prejudgment and postjudgment interest.  *See Granite State I*, 553 F. Supp. 3d at 424; (Pl.'s Mot. Summ. J., DN 43).  Defendants have filed a cross-motion for summary judgment seeking dismissal of Granite State's claims.  (Defs.' Mot. Partial Summ. J., DN 44).

## II.     <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

## III.     <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If this lack of material fact is established, the burden then shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, "is not required to be resolved conclusively in favor of the party asserting its existence . . . ."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).  If the record taken as a whole could not support a finding of fact in favor of the nonmoving party, the motion should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard operates likewise with cross-motions for summary judgment.  *See Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016).  Accordingly, "the court must evaluate each party's motion on its own merits, taking care in each instance to

draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (citation omitted).

## IV.    DISCUSSION

### A.    Piercing the Corporate Veil

Granite State seeks to pierce Star Mine's corporate veil, arguing Defendants dominated Star Mine by controlling the assets of the corporation and that recognizing Star Mine as a corporate entity would promote injustice because Defendants drained Star Mine's assets. (Pl.'s Mot. Summ. J. 9-13). "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Id.* (citation omitted). "[T]he corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. 51, 61-63 (1998). "The burden of proof to demonstrate grounds for piercing the corporate veil is on the party seeking to impose liability on the parent corporation." *Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC*, 988 F. Supp. 2d 772, 783 (W.D. Ky. 2013) (citing *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007)).

The Kentucky Supreme Court has articulated the doctrine of piercing the corporate veil:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in

4

which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice.

*Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 155 (Ky. 2012); *see Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 174-75 (Ky. 2012). Kentucky courts recognize two traditional but "essentially interchangeable" methods of piercing the corporate veil: the "alter ego" theory and the "instrumentality" theory. *Bear, Inc. v. Smith*, 303 S.W.3d 137, 147 (Ky. App. 2010) (citation omitted); *Inter-Tel Techs.*, 360 S.W.3d at 165.

### 1.    *Loss of Corporate Separateness*

The Kentucky Supreme Court has considered many factors to determine whether the domination of the corporation has resulted in the "loss of corporate separateness[,]" but emphasizes "the most critical factors are 'grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the 'subsidiary's operations and decisions, particularly those of a day-to-day nature.'" *Thornton v. Dutch Nats. Processing, LLC*, 629 F. Supp. 3d 777, 797 (M.D. Tenn. 2022) (citations omitted) (applying Kentucky law). In addressing the loss of corporate separateness, Granite States focuses on whether: (i) "Star Mine was grossly undercapitalized"; (ii) "Star Mine displayed an egregious failure to observe legal and corporate formalities and a disregard of distinctions between the company and its shareholders"; and (iii) "there was a high degree of control by the shareholders over the company's operations and decisions." (Pl.'s Mot. Summ. J. 9-12).

### a.    Capitalization

In general, "Kentucky law does not require a minimum amount of paid-in capital . . . ." *Inter-Tel Techs.*, 360 S.W.2d at 162 (citation omitted). Nevertheless, Granite State argues that this subfactor supports piercing the corporate veil because Star Mine was drained of all its assets before

5

the sale through distributions to shareholders in December 2018 and distribution of substantially all company assets after the sale was finalized. (Pl.'s Mot. Summ. J. 10). Defendants cite bankruptcy and the economic decline in the coal industry ultimately leading to Star Mine's own downturn that prompted the deal with Raleigh. (Bowles Dep. 14:4-11). Star Mine had a December 31, 2018, book value of just over $290,000, before the sale and distribution. (Pl.'s Mot. Summ. J. Ex. 10, at 1-2; Pl.'s Mot. Summ. J. Ex. 7, at 1). The sale of Star Mine to Raleigh took place on January 1, 2019, at a price of more than $1.4 million. (Pl.'s Mot. Summ. J. Ex. 7, at 1; Pl.'s Mot. Summ. J. Ex. 14, at 3). Star Mine ultimately dissolved on January 31, 2019, after submitting articles of dissolution in Kentucky. (Pl.'s Mot. Summ. J. Ex. 17, at 1). On February 28, 2019, Star Mine had a remaining cash balance of $20,495.07. (Defs.' Resp. Pl.'s Mot. Summ. J. Ex. K, at 2). Defendants aver that this money was left in the corporation's account in order to cover any outstanding liabilities of Star Mine. (Defs.' Resp. Pl.'s Mot. Summ. J. 12).

In *Inter-Tel Technologies*, the company had "grossly inadequate capital for day-to-day operations because it had no funds at all, literally nothing of its own." *Inter-Tel Techs.*, 360 S.W.3d at 167. Given that Star Mine owed Granite State over $1 million, it is apparent that Star Mine was grossly undercapitalized after the 2018 and 2019 distributions to Defendants. (Pl.'s Mot. Summ. J. Ex. 7, at 1; Pl.'s Mot. Summ. J. 10; Pl.'s Mot. Summ. J. Ex. 10, at 1-2; Pl.'s Mot. Summ. J. Ex. 14, at 1-3). Thus, this subfactors weighs strongly in favor of piercing the corporate veil.

### b.    Legal and Corporate Formalities, and Disregard of Entity

Another relevant subfactor is legal and corporate formalities. The record reflects Star Mine followed corporate formation and procedural formalities under many of these factors. *Thornton*, 629 F. Supp. 3d at 797 (citations omitted). Defendants concede that Star Mine issued stock, and that "Defendants were not merely shareholders of [Star Mine], but employees as well." (Defs.'

Resp. Pl.'s Mot. Summ. J. 11, 14, DN 49).  Star Mine was a corporation that had:  (i) registered in Kentucky; (ii) bylaws, articles of incorporation, and shareholders' agreements; and (iii) issued stock.  (Defs.' Resp. Pl.'s Mot. Summ. J. Ex. O, at 1-14, 37, DN 49-15).  Though they contained little detail and were irregularly taken, Star Mine still kept minutes of meetings.  (Defs.' Resp. Pl.'s Mot. Summ. J. Ex. O, at 19-36).  Star Mine's shareholders also served as officers.  (Bowles Dep. 8:7-9:19).  These officers later became employees of Raleigh after Star Mine was acquired. (Bowles Dep. 7:7-16).  Though officers like Bowles did not pay initially to acquire shares, their service was the offer of value for ownership, and they received distributions of profits from Star Mine.  (Bowles Dep. 9:20-10:20; Pl.'s Mot. Summ. J. Ex. 10, at 1-2).  This subfactor weighs against piercing the corporate veil.

### c.    Control of Shareholders

Finally, Granite State points to the level of shareholder control, and this subfactor considers whether there was a "high degree of control . . . over . . . operations and decisions, particularly those of a day-to-day nature." *Thornton*, 629 F. Supp. 3d at 797 (citations omitted).  Granite State argues that the shareholders ignored formalities and were maintaining control over the corporation. (Pl.'s Mot. Summ. J. 11-12).  However, "[o]wnership and control of a corporate entity by the persons sought to be held liable is . . . not sufficient by itself for denial of entity treatment." *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976) (citation omitted).  As noted, Star Mine complied with basic formalities.  The shareholders held officer positions and some provided labor as their offer of value for ownership in the company.  (*See* Bowles Dep. 8:7-9:19, 9:20-10:20). Star Mine appears to have been operating appropriately with officers acting in a "specific role or 'sphere of influence' based upon their particular skill set." (Defs.' Resp. Pl.'s Mot. Summ. J. 14). Under this subfactor, veil piercing is neutral.

7

## 2.    *Sanctioning of Fraud or Promoting of Injustice*

Under this second factor, Granite State argues that failing to pierce the corporate veil would promote the injustice of Granite State's inability to collect the total judgment from the parties' previous litigation of $1,366,378, plus interest and costs. *See Granite State I*, 553 F. Supp. 3d at 424. Piercing the corporate veil is appropriate where failure to do so would operate to sanction fraud, bad faith, or injustice. *Inter-Tel Techs.*, 360 S.W.3d at 165; *Pro Tanks Leasing*, 988 F. Supp. 2d at 792-93 (citation omitted). Such injustice occurs where a controlling entity or group's actions renders the corporation financially unable to pay its obligations or assigns all liabilities to an asset-free corporation that creates an asset-rich corporation without liabilities. *Inter-Tell Techs.*, 360 S.W.3d at 164, 167-68; *see also Thornton*, 629 F. Supp. 3d at 801-03 (citations omitted).

This court has recognized that an unsatisfied judgment is not necessarily sufficient to justify piercing the corporate veil; the injustice must go beyond a failure to collect a corporation's debt. *Pro Tanks Leasing*, 988 F. Supp. 2d at 792-93 (citing *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522-24 (7th Cir. 1991)); *see also Thornton*, 629 F. Supp. 3d at 801-03 (citations omitted). In this instance, however, selling Star Mine with 100% of the proceeds paid to its officers/shareholders and leaving nothing for payment of its outstanding liability constitutes the precise bad faith or fraud that piercing the corporate veil was intended to address. *See Granite State I*, 553 F. Supp. 3d at 424.

Based on the factors, the Court finds that piercing the corporate veil is warranted under the circumstances in this case. Accordingly, Plaintiff's motion for summary judgment as to declaratory relief for piercing the corporate veil is granted.[3]

---

[3] Granite State seeks joint and several liability as to recovery of the judgment amount but does not provide authority supporting this proposition. (Pl.'s Mot. Summ. J. 22). Kentucky courts have found joint and several liability to be appropriate when the corporate veil is pierced: "In any event,

B.    <u>Voiding the Transactions under KRS 378A.040 and 378A.050</u>

In its motion, Granite State also seek to void the December 2018 and February 2019 shareholder distributions because Defendants acted with "actual intent . . . to defraud" under KRS 378A.040 and KRS 378A.050.  (Pl.'s Mot. Summ. J. 15-16 (citation omitted)).  In the alternative, Granite State argues that there was not a "reasonably equivalent value" exchanged and the debt was beyond Star Mine's ability to pay.  (Pl.'s Mot. Summ. J. 15-16 (citation omitted)).  Defendants also move for summary judgment, contending that Granite State has failed to bring their claim within the one-year statute of limitations and that they acted in good faith.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 9-11, DN 44-1).

The Kentucky Uniform Voidable Transactions Act ("UVTA") makes a debtor's transfers or obligations voidable as to the creditor in certain circumstances.  *See* KRS 378A.040(1)(a).  The statute requires that a debtor performed the transaction:

(a)    With actual intent to hinder, delay or defraud any creditor of the debtor; or
(b)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
    1.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
    2.    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

KRS 378A.040(1)(a).  Additionally, KRS 378A.050(2) provides:

A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made, if the transfer was made to an insider for an antecedent debt,

---

piercing the corporate veil and vicarious liability are distinct theories of joint and several liability." *Providence Grp., Inc. v. Holbrook*, No. 2022-CA-01279-MR, 2024 WL 1335534, at *4 (Ky. App. Mar. 29, 2024); *see also Elder Constr. & Assocs., Inc. v. Georgetown-Scott Cnty. Airport Bd.*, No. 2023-CA-0997-MR, 2025 WL 727680, at *4 (Ky. App. Mar. 7, 2025) (affirming Scott Circuit Court's holding of veil piercing and assigning joint and several liability to the president and shareholder of a corporation).

the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

KRS 378A.050(2).  The UVTA utilizes factors to show actual intent under the statute as such as disclosure or concealment of the transfer, "transfer occurred shortly before or shortly after a substantial debt was incurred," "the transfer was made or obligation was incurred, "the debtor had been sued or threatened with suit," or "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred" as evidence of intent.  KRS 378A.040(1)-(2).  "[A] single badge of fraud is enough [to] raise a presumption that the challenged transfer is fraudulent."  *Ky. Petroleum Operating Ltd. v. Golden*, No. 12-164-ART, 2015 WL 927358, at *4 (E.D. Ky. Mar. 4, 2015) (citations omitted) (holding one instance of fraud is sufficient to sustain summary judgment to void a transaction under KRS 378.010).

The Kentucky Supreme Court has not addressed the standard of proof required by a defendant to establish good faith, but the defendant must show some level of good faith in order to survive summary judgment.  *See id.* at *5 (citations omitted).  If a defendant does not provide a basis supporting its good faith or simply "dodge[s] the good-faith inquiry," a court may grant summary judgment.  *See id.* (citations omitted).  Furthermore, "Kentucky courts have found transfers avoidable when the surrounding circumstances fly in the face of common sense/reasonable business practices and are accompanied by unbelievable narratives."  *Grayiel v. AIO Holdings, LLC*, 648 F. Supp. 3d 812, 857 (W.D. Ky. 2022).  Defendants and Granite State both agree that KRS 378A.050 only applies to a present creditor.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 8-9; Pl.'s Resp. Defs.' Mot. Partial Summ. J. 3-4, DN 50).

As a preliminary matter, Defendants allege that KRS 378A.090 imposes a time bar on claims that prohibits Granite State from proceeding.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 9-11).  The statute provides:

10

(1)     Under KRS 378A.040(1)(a), not later than four (4) years after the transfer was made or the obligation was incurred or, if later, not later than one (1) year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(2)     Under KRS 378A.040(1)(b) or 378A.050(1), not later than four (4) years after the transfer was made or the obligation was incurred; or

(3)     Under KRS 378A.050(2), no later than one (1) year after the transfer was made.

KRS 378A.090.[4]  Granite State does not specify in its complaint under which specific provision it brings its claim but clarifies in its response that the claim is not brought under KRS 378A.050(2). (Pl.'s Resp. Defs.' Mot. Partial Summ. J. 3-4).  Defendants allege that Granite State discovered the transaction in 2020.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 9-10).  Under the statute, any claim relating to the December 2018 and February 2019 distributions would toll in December 2022 and February 2023 respectively; this lawsuit was filed August 26, 2022.  *See* KRS 378A.090. Defendants do not contest this in their reply, and their assertion of the limitations defense is denied because Granite State brought its action less than four years after the December 2018 distribution.

Under the statute, Granite State argues that it is entitled to summary judgment voiding the December 2018 and February 2019 transactions because it has shown fraud in the form of irregularities in the balance sheet and the failure to log the distributions in Star Mine's records. (Pl.'s Mot. Summ. J. 16, 18-20).  Star Mine's 2019 records show there were $300,000 shareholder distributions to Bowles and Lee, and $800,000 to P'Pool.  (Pl.'s Mot. Summ. J. Ex. 14, at 1-2). Granite State also argues that Defendants' actual intent is evidenced by the efforts by Granite State to collect the unpaid debt due from Star Mine.  (Mem. Op. & Order 2).  Defendants allege that they kept money in Star Mine's account in order to pay back bills, and Star Mine did not pay

---

[4] Granite State has brought claims under KRS 378A.040 and KRS 378A.050.  (Compl. ¶¶ 29-35, DN 1).

Granite State because it disputed the amount owed, nor had it realized that it had an outstanding bill or debt. (Bowles Dep. 22:l-23:4; Taylor Dep. 71:18-73:10).

Granite State has met its burden, and Defendants' arguments are not well-taken. The payment of the sale went straight to the shareholders rather than Star Mine when it was bought by Raleigh. (Taylor Dep. 53:7-10). Defendants knew of an outstanding financial obligation to Granite State for the audited payroll calculations. (*See* Bowles Dep. 19:15-19, 22:1-23:4; Taylor Dep. 71:18-73:10). Taylor, Bowles, and P'Pool each signed an August 2018 endorsement indicating $345,000 was owed to Granite State for the insurance premiums. (Taylor Dep. 21:22-21:25, 30:2-5). Lori Oakley, a third-party accountant for Star Mine, testified that she was not aware that Granite State had sent a statement to Star Mine for the $345,000 in additional premiums owed, which would have been listed as a liability listed on Star Mine's balance sheet. (Oakley Dep. 4:20-5:13, 20:13-25, May 28, 2024, DN 43-12). Star Mine had an insufficient balance in its account at the end of 2018 to pay its debt to Granite State after its distributions to Defendants. (*See* Pl.'s Mot. Summ. J. Ex. 7, at 1).

Taylor could not recall any discussion among the officers nor between Star Mine and Raleigh about Star Mine's outstanding liability to Granite State. (Taylor Dep. 46:3-17). Taylor was, however, aware that Granite State was auditing Star Mine for the Policy payment even after the dissolution of Star Mine. (Taylor Dep. 62:1-7). Bowles claimed that he believed the premium owed was for the following year's premium but acknowledged a deficiency for past payments. (Bowles Dep. 22:1-23:4). He never spoke with Granite State but believed Star Mine was owed money because Granite State had not given adequate notice of cancellation. (Bowles Dep. 26:12-14; 27:11-14). The notice of cancellation was dated October 16, 2018, and cited failure to pay the premium as the reason for cancellation. (Pl.'s Mot. Summ. J. Ex. 9, at 1).

Bowles contradicts himself, however, noting that the insurance was canceled because of the nonpayment but also claims the premiums due were for future coverage.  (Bowles Dep. 19:9-19, 21:1-14, 22:1-23:4).  It is an "unbelievable narrative" that Star Mine's shareholders believed *they* were owed money by Granite State after failing to meet its prior premium obligations, which certainly does not support a good faith exception.  *Grayiel*, 648 F. Supp. 3d at 857; *see Ky. Petroleum Operating Ltd.*, at *5 (citations omitted).  The combination of the pretextual reasons for failing to pay Granite State with the failure to list the Granite State premiums due in its financial records sustains Granite State's burden to show Defendants' actual intent.  (*See* Bowles Dep. 19:9-19, 21:1-14, 22:1-23:4; Oakley Dep. 4:20-5:13, 20:13-25).  Granite State's motion as to the voidable transactions claim is granted.

**C.    KRS 271B.8-330 and Standing**

Granite State seeks summary judgment on its claim that Defendants are personally liable as directors of Star Mine for improperly giving themselves a distribution when Star Mine could not pay its debts.  (Pl.'s Mot. Summ. J. 21-22).  Defendants respond that Granite State is barred from bringing the claim for the December 2018 Distributions and the February 2019 Distributions by the statute of limitations.  (Defs.' Resp. Pl.'s Mot. Summ. J. 20; Defs.' Mem. Supp. Mot. Partial Summ. J. 11-14).  They alternatively argue that Granite State lacks standing under the statute to bring this claim.  (Defs.' Resp. Pl.'s Mot. Summ. J. 20; Defs.' Mem. Supp. Mot. Partial Summ. J. 11-14).  In relevant part, KRS 271B.8-330 includes:

> (1)    A director who votes for or who assents to a distribution made in violation of KRS 271B.6-400 or the articles of incorporation shall be personally liable to the corporation for the amount of the distribution that exceeds what could have been distributed without violating KRS 271B.6-400 or the articles of incorporation if it is established that he did not perform his duties in compliance with KRS 271B.8-300. In any proceeding commenced under this section, a director shall have all of the defenses ordinarily available to a director.

(2)    A director held liable under subsection (1) of this section for an unlawful distribution shall be entitled to contribution:

    (a)    From every other director who could be held liable under subsection (1) of this section for the unlawful distribution; and

    (b)    From each shareholder for the amount the shareholder accepted knowing the distribution was made in violation of KRS 271B.6-400 or the articles of incorporation.

Under KRS 271B.6-400(3), there are limits on distributions to shareholders that include when:

No distribution shall be made if, after giving it effect:

    (a)    The corporation would not be able to pay its debts as they become due in the usual course of business; or

    (b)    The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

KRS 271B.6-400(3).  This does not apply only when the board determines the distribution is "reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances."  KRS 271B.6-400(4).

As to standing, Defendants incorrectly argue that Granite State is not an appropriate party to bring the claim.  Both Kentucky and federal courts have recognized that a claim by a creditor may proceed under the statute since corporate officers owe a duty to a corporation's creditors. *Bank of Am., N.A. v. Corporex Cos.*, 99 F. Supp. 3d 708, 718 (E.D. Ky. 2015) ("A line of Kentucky cases indicates that corporate officers owe duties to a corporation's creditors in some circumstances."  (citations omitted)).

Defendants assert that Granite State has failed to bring its claim within the statute of limitations and that they acted in good faith.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 9-11). KRS 271B.8-330 provides a claim is barred "unless it is commenced within two (2) years after the

date on which the effect of the distribution was measured under subsection (5) or (7) of KRS

271B.6-400." KRS 271B.8-330(3).  KRS 271B.6-400 provides:

> (1)    A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (3) of this section.
>
> (2)    If the board of directors does not fix the record date for determining shareholders entitled to a distribution (other than one involving a purchase, redemption or other acquisition of the corporation's shares), it shall be the date the board of directors authorizes the distribution.
>
> (3) No distribution shall be made if, after giving it effect:
>
>> (a)    The corporation would not be able to pay its debts as they become due in the usual course of business; or
>>
>> (b)    The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.
>
> (4)    The board of directors may base a determination that a distribution is not prohibited under subsection (3) of this section either on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.
>
> (5)    Except as provided in subsection (7) of this section, the effect of a distribution under subsection (3) of this section shall be measured:
>
>> (a)    In the case of distribution by purchase, redemption, or other acquisition of the corporation's shares, as of the earlier of:
>>
>>> 1.    The date money or other property is transferred or debt incurred by the corporation; or
>>>
>>> 2.    The date the shareholder ceases to be a shareholder with respect to the acquired shares;
>>
>> (b)    In the case of any other distribution of indebtedness, as of the date the indebtedness is distributed; and
>>
>> (c)    In all other cases, as of:
>>
>>> 1.    The date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization; or
>>>
>>> 2.    The date the payment is made if it occurs more than one hundred twenty (120) days after the date of authorization.
>
> (6)    A corporation's indebtedness to a shareholder incurred by a reason of a distribution made in accordance with this section shall be at parity with the corporation's indebtedness to its general creditors except to the extent subordinated by agreement.

(7)    Indebtedness of a corporation, including indebtedness issued as a distribution, shall not be considered a liability for purposes of determinations under subsection (3) of this section if its terms provide that payment of principal and interest are made only if and to the extent that payment of a distribution to shareholders could then be made under this section.  If the indebtedness is issued as a distribution, each payment of principal or interest shall be treated as a distribution, the effect of which is measured on the date the payment is actually made.

KRS 271B.6-400.

The Kentucky Supreme Court has applied the "disinterested majority" test of the Adverse Domination Doctrine when tolling a claim under the statute.  *Wilson v. Paine*, 288 S.W.3d 284, 288-89 (Ky. 2009) (citations omitted) ("We, therefore, adopt the "disinterested majority" version of the adverse domination doctrine.").  "[A] plaintiff is required to show that a majority of the board members were wrongdoers during the period the plaintiff seeks to toll the statute of limitations."  *Id*. (citations omitted).  There is no question that Bowles, Taylor, and P'Pool owned all of the shares of Star Mine and received the distributions from the end of 2018 and the proceeds from the sale of Star Mine.  (Pl.'s Mot. Summ. J. Ex. 10, at 1-2; Pl.'s Mot. Summ. J. Ex. 14, at 1-3).  Under *Wilson*, claims from the December 2018 and February 2019 distributions would be tolled until at least December 2022, three years after Granite State learned of the transactions.  (Pl.'s Resp. Defs.' Mot. Partial Summ. J. 6).  Thus, this action brought in August 2022 is not barred by KRS 271B.6-330.

As to Granite State's motion for summary judgment, its motion must be granted for the same reasons Defendants' motion is denied.   The proceeds from the sale of Star Mine to Raleigh went straight to Defendants.  (Taylor Dep. 53:7-10).  Defendants were on notice of the outstanding financial obligation to Granite State as reflected by the August 2018 endorsement signed by each Defendant, Granite State's audit, and the October 2018 notice given by Granite State of the Policy's cancellation due to nonpayment.  (*See* Bowles Dep. 19:15-19, 22:1-23:4; Taylor Dep.

16

21:22-21:25, 30:2-5, 62:1-7, 71:18-73:10; Pl.'s Mot. Summ. J. Ex. 9, at 1).   Star Mine had

insufficient assets at the time of the sale in February 2019 to pay its debt to Granite State, but

Defendants received distributions from the sale despite this outstanding liability.  (*See* Pl.'s Mot.

Summ. J. Ex. 7, at 1; Pl.'s Mot. Summ. J. Ex. 16, at 3; Defs.' Resp. Pl.'s Mot. Summ. J. Ex. K, at

2; Pl.'s Mot. Summ. J. Ex. 10, at 1-2; Pl.'s Mot. Summ. J. Ex. 14, at 1-3).  Defendants' arguments

regarding their misunderstanding of Star Mine's solvency are blatantly contradicted by the

company's financial records.  (*See* Bowles Dep. 19:9-19, 21:1-14, 22:1-23:4, 26:12-14, 27:11-14;

Oakley Dep. 4:20-5:13, 20:13-25).  Granite State's motion is granted.

### D.   File Exhibits Under Seal

To determine whether to seal documents, "a court must balance the litigants' privacy

interests against the public's right of access, recognizing our judicial system's strong presumption

in favor of openness."  *Rudd Equip. Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594

(6th Cir. 2016).   To overcome that presumption, the proponent must demonstrate:   "(1) a

compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's

interest in accessing the records; and (3) that the request is narrowly tailored."  *Kondash v. Kia

Motors Am., Inc.*, 767 F. App'x 635, 637-38 (6th Cir. 2019) (citing *Shane Grp., Inc. v. Blue Cross

Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)).  In doing so, the proponent must show

that "disclosure will work a clearly defined and serious injury" and "analyze in detail, document

by document, the propriety of secrecy, providing reasons and legal citations."  *Shane Grp.*, 825

F.3d at 305-06, 307 (quoting *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001); *Baxter Int'l,

Inc. v. Abbott Lab'ys*, 297 F.3d 544, 548 (7th Cir. 2002)).  Additionally, "'[i]n civil litigation, only

trade secrets, information covered by a recognized privilege (such as the attorney-client privilege),

and information required by statute to be maintained in confidence (such as the name of a minor

17

victim of a sexual assault),' is typically enough to overcome the presumption of access." *Shane Grp.*, 825 F.3d at 308 (citing *Baxter*, 297 F.3d at 546).

Granite State's motion is unclear as to what information it seeks to safeguard. Granite State notes it filed the sensitive documents with redactions to protect sensitive information, negating the need to seal these documents. (Pl.'s Mot. Leave File Seal 1-2, DN 45). Without more, this falls far short of the "compelling interest" or "clearly defined and serious injury" required to outweigh the public's interest. The motion is denied. *See Shane Grp.*, 825 F.3d at 305-06, 307 (citations omitted).

## V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Plaintiff's Motion for Summary Judgment (DN 43) is **GRANTED**.[5]  Taylor, Bowles, and P'Pool[6] shall be jointly and severally liable to Granite State in the amount of $1,370,602.31 plus prejudgment and postjudgment interest and costs incurred herein.

2.    Defendants' Motion for Partial Summary Judgment (DN 44) and Plaintiff's Motion to File Exhibits Under Seal (DN 45) are **DENIED**.

3.    The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

July 8, 2025

cc:    counsel of record
       J. Todd P'Pool

---

[5] In its motion, Granite State also seeks to recover $1.61 million in improper shareholder distributions. (Pl.'s Mot. Summ. J. 10-11). That is not its measure of damages. Rather, Granite State is only entitled to recover the amount adjudicated in *Granite State I*.

[6] The Court previously entered default judgment against P'Pool in this action. (J., DN 22).